# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Mark R. Krueger,

                        Plaintiff,        Case No. 19-10581

v.                                        Judith E. Levy
                                          United States District Judge
Experian Information Solutions,
Inc., Trans Union LLC, and Cenlar        Mag. Judge David R. Grand
FSB,

                        Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [33] AND GRANTING DEFENDANT CENLAR'S MOTION FOR <u>SUMMARY JUDGMENT [40]</u>

Before the Court is Plaintiff Mark Krueger's motion for partial summary judgment (ECF No. 33) and Defendant Cenlar FSB's cross-motion for summary judgment. (ECF No. 40.) Cenlar serviced Plaintiff's second mortgage on an income-producing property that had been discharged in Chapter 13 bankruptcy. After the debt was discharged, it continued to appear on credit reports furnished by Defendant Experian

Information Solutions[1] and Defendant Trans Union LLC.[2] Plaintiff filed multiple disputes to these two consumer reporting agencies (CRAs) informing them that the reports were incorrect; the CRAs, as required by law, turned to Cenlar to verify the information on their reports. Plaintiff alleges that Cenlar willfully, or alternatively, negligently breached its statutory duty to reasonably investigate Plaintiff's disputes and correct the CRAs under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s-2(b).

For the reasons set forth below, the Court denies Plaintiff's motion for summary judgment and grants Cenlar's motion for summary judgment.

## I.    Background

Plaintiff filed for Chapter 13 bankruptcy on May 8, 2012. *See In re Mark Robert Krueger*, No. 12-51534 (Bankr. E.D. Mich.). Included in his repayment plan was a second mortgage on an income-producing property, which was serviced by GMAC Mortgage and then transferred

---

[1] On February 28, 2020, Plaintiff and Experian stipulated to dismissal with prejudice. (ECF No. 39.)

[2] On August 1, 2019, Plaintiff and Trans Union stipulated to dismissal with prejudice. (ECF No. 29.)

to Cenlar in 2014. GMAC entered into an agreement to strip the lien on the mortgage if Plaintiff successfully completed his Chapter 13 plan and received discharge. (ECF No. 40-4, PageID.618.) On January 23, 2018, Plaintiff received discharge as a result of successfully making all payments required by the Chapter 13 plan. (ECF No. 38-4, PageID.518.) By that time, Cenlar began taking steps under the lien-stripping agreement to remove the balances owed from Plaintiff's account. (ECF No. 39, PageID.489; ECF No. 33, PageID.259.) Plaintiff's bankruptcy case was officially closed on April 30, 2018. (ECF No. 40-4, PageID.616.)

In February 2018—less than a month after receiving his January discharge from the Chapter 13 bankruptcy but before his case closed in April– Plaintiff checked his credit report from three major CRAs: Equifax, Experian, and Trans Union. He discovered that his credit score was lower than he had hoped, and learned that all three CRAs were inaccurately reporting that his account with Cenlar was open and had a balance of $29,453 with over $10,000 past due, when it had in fact been discharged in bankruptcy weeks before. (ECF No. 33-3, PageID.335–37; ECF No. 33-3, PageID.349.) That same month, Plaintiff submitted online

disputes to the CRAs and they, as required by law, forwarded the disputes to Cenlar to reinvestigate.

Cenlar's statutory duty when it receives such disputes is to: (1) conduct an investigation; (2) review any information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report any inaccuracies to all CRAs which may have received inaccurate information, and (5) correct any inaccuracies in the information it provides. *See Shaw v. Equifax Info. Sols., Inc.*, 204 F. Supp. 3d 956, 959–60 (E.D. Mich. 2016) (citing 15 U.S.C. § 1681s–2(b)(1)(E)). Cenlar asserts that it took these steps. Nonetheless, only one of the three CRAs, Equifax, updated Plaintiff's credit report accurately. (ECF No. 33-3, PageID.423.) Trans Union and Experian continued to improperly report Plaintiff's account with Cenlar as open with late payments and a past-due balance. (ECF No. 33, PageID.171.)

Throughout 2018 and into 2019, Plaintiff sent at least six more disputes to the CRAs, which Cenlar responded to in turn. (ECF No. 40, PageID.584.) At one point in 2018, Trans Union began reporting the account as closed with no balance, but began re-reporting it as open in February 2019. (ECF No. 33, PageID.172.) Experian continuously

4

reported the account as open with a past-due balance during this time period. (*Id.*) Plaintiff states that he contacted Cenlar directly by phone in March 2019 to discuss the account and that Cenlar's representatives informed Plaintiff that they were unable to discuss it because Plaintiff was in the midst of Chapter 13 bankruptcy, although he was not. (ECF No. 33, PageID.173; ECF No. 33-3, PageID.415.) Cenlar does not have records of a conversation directly with Plaintiff, and, while it noted some communication may have taken place with Plaintiff's bankruptcy attorney, it is unclear who was part of the communication or when it took place. (ECF No. 33-2, PageID.284–285.) The Cenlar account was completely removed from Plaintiff's credit report by February 21, 2019. (ECF No. 38, PageID.523.)

Plaintiff's lawsuit alleges that Cenlar violated the FCRA, specifically with regard to 15 U.S.C. § 1681s-2(b). Plaintiff alleges that Cenlar acted willfully under section 1681n of the FCRA and negligently under section 1681o in its investigation and review, resulting in inaccurate reporting to the CRAs. He argues that he is entitled to actual, statutory, and punitive damages under the FCRA. (ECF No. 1.) Cenlar denies Plaintiff's allegations. (ECF No. 13.)

In Cenlar's motion for summary judgment, it argues that Plaintiff's claim fails because he cannot prove actual damages, lacks standing, and cannot prove that Cenlar's actions were willful. (ECF No. 40.) In Plaintiff's motion for summary judgment, he argues that Cenlar violated the FCRA as a matter of law when it failed to conduct a reasonable investigation of Plaintiff's dispute, and then willfully made inaccurate reports to the CRAs. (ECF No. 33.)

## II.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

## A.    Cenlar's Motion for Summary Judgment

### 1. Willful Violation

As set forth above, under section 1681n of the FCRA, Plaintiff must show that Cenlar acted willfully in failing to comply with its statutory duties pursuant to the FCRA, resulting in inaccurate reporting to CRAs. 15 U.S.C. §1681n. There are five statutory duties imposed on furnishers of consumer information under the FCRA section 1681s–2:

> After receiving notice pursuant to [§] 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
>
> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the [CRA] pursuant to [§ ] 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the [CRA];
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a [CRA] only, as appropriate, based on the results of the reinvestigation promptly—

7

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. §1681s-2(b).

In *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 614–15 (6th Cir. 2012), the Sixth Circuit explained that "the investigation an information furnisher undertakes must be a reasonable one." *Id*. at 616. The investigation must be "at least something more than a merely cursory review." *Id*. It must also involve reviewing "all relevant information," however, "the nature and specificity of the information provided by the CRA to the furnisher may affect the scope of the investigation required by the furnisher." *Id*. at 617.

If the investigation finds "incomplete or inaccurate" information, then the furnisher "must report those results" to all other CRAs. *Id*. And finally, the furnisher "must either 'modify,' delete,' or 'permanently block the reporting of' information that it finds upon investigation to be inaccurate or incomplete" *Id*. citing §1681s-2(b)(1)(E).

The FCRA provides for punitive damages for willful violations of the statute. 15 U.S.C. § 1681n(a)(2). The Sixth Circuit has explained, "[i]n order to willfully violate the FCRA, a CRA's action must entail 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604, 610 (6th Cir. 2016) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 48 (2007)).

In *Boggio v. USAA*, the Sixth Circuit held that an issue of material fact existed as to whether the defendant acted willfully or in reckless disregard of its FCRA duties. 696 F.3d at 620. Prior to a divorce, and allegedly unbeknownst to him, the plaintiff's wife signed the plaintiff's name as a co-obligor when obtaining financing from the defendant for a new vehicle. *Id*. at 613. When the plaintiff and his wife began divorce proceedings some time later, the plaintiff discovered the loan and argued that his ex-wife alone should be responsible for paying it. *Id*. At the time of their divorce, however, the loan appeared on the plaintiff's credit report. *Id*.

A year later, in October 2009, the plaintiff's ex-wife fell behind on loan payments, and the plaintiff experienced credit problems. *Id*. The

plaintiff's attorney filed a dispute with the CRAs and with the defendant regarding the plaintiff's status as a co-obligor on his ex-wife's loan. *Id*. The defendant received requests from the CRAs to verify the disputed loan, and reported back that the plaintiff was a co-obligor. *Id*. As part of its investigation, the defendant attempted to mail the plaintiff (but not his attorney) a copy of the allegedly-forged check, but sent it to the wrong address. *Id*. at 614. Next, the defendant informed the plaintiff that he would need to file a police report or sign a fraud affidavit before it would further investigate. *Id*. Then, in March 2010, the defendant declared the dispute a "civil matter between the [plaintiff and his ex-wife]" and did not investigate. The plaintiff sued the defendant for willful disregard of its duties.

The Sixth Circuit held that, while the defendant may not have acted to intentionally harm the plaintiff, this does not preclude a finding that the defendant recklessly disregarded its duty to investigate. It found that the defendant employee's declaration that the defendant had followed its internal procedures was unpersuasive, particularly where the defendant attempted to send the plaintiff a copy of the disputed check but sent it to the wrong address. *Id*. Accordingly, the Sixth Circuit found, the plaintiff

"has produced evidence sufficient to present a genuine dispute regarding whether [the defendant] violated §1681s-2(b)." *Id*. at 620.

The case *Smith v. LexisNexis* does not involve a furnisher report such we have here but does illustrate circumstances where the plaintiff did not make a showing sufficient to sustain a willfulness claim under the FCRA.  837 F.3d 604. There, the plaintiff applied for a job with an employer, which carried out criminal history checks for applicants using the defendant as a contractor. *Id*. at 606. The defendant ran the search on the plaintiff using his first name, last name, and date of birth; but not his middle name. *Id*. The search resulted in showing a fraud conviction for someone else who shared all but the plaintiff's middle name. This result delayed plaintiff's hiring by six weeks. He experienced less pay per hour for the six-week period than he would have had if he had been hired immediately. He also stated that he was depressed and experienced stress over how he could make a living. He and his wife borrowed money from family members to make ends meet for the six-week period, which caused the plaintiff feelings of shame. *Id*. at 608.

The plaintiff sued the defendant, and a jury found the defendant both willfully and negligently violated the FCRA for failing to include the

plaintiff's middle name in its criminal records search. *Id*. at 609–10. The Sixth Circuit reversed the jury's finding as to the willfulness claim. It held that the case was a "far cry from being willful." *Id*. at 610.

Similarly, here Plaintiff has not shown that Cenlar willfully disregarded its statutory duties in investigating Plaintiff's dispute. Cenlar's representative, whose title is "Late Stage Default Corporate Representative," Chad Parish, testified regarding Cenlar's procedures for when it receives a dispute. First, Mr. Parish acknowledged that Cenlar was aware of Plaintiff's Chapter 13 bankruptcy when it first took on servicing of and "onboarded" his loan in about 2013. (*Id*. at PageID.231.) He testified that disputes are received via a program called e-OSCAR and forwarded to a group within Cenlar called the "third party operational group." (ECF No. 33-2, PageID.200.) This division of Cenlar then reviews the dispute "within a timely manner and provides a response back" to the CRA. (*Id*., PageID.219.) He stated that,

> When someone receives a dispute through the e-OSCAR program, they're going to follow the procedures that were in that thing. They're going to review, if it is an initial dispute, they're going to review it entirely. If it is a second or third dispute, they're going to review the prior disputes. They are going to review, they're going to review the prior credit bureau

reporting history. They're going to review the payment history, if it had to do with that. And they're going to review the, you know, system notes on what was or how—well, they're going to review the system notes on an initial dispute and then review the notes on prior disputes to come up with whatever they are—whatever the resolution is that they are going to come up with.

They would have also reviewed, they would have reviewed the status of the bankruptcy in the bankruptcy arena workstation to show, okay, is it active, is it inactive, what is the discharge date, what type of bankruptcy it was. And then they're going, once they complete all that, then they're going to respond to the ACDV[3] accordingly.

(ECF No. 33-2, PageID.269–270.)

He testified that it would be inappropriate for Cenlar to continue to report on a loan that had been discharged in bankruptcy (*id.*, PageID.238), but that here, Cenlar did no such reporting of the discharged loan. Mr. Parish testified, "[u]pon review of the records I saw, no, there was no delinquent reporting done on the loan." (*Id.*, PageID.238.)

Notably, at the time Plaintiff sent his first dispute to Cenlar in early 2018, very soon after his bankruptcy proceedings closed, the information

---

[3] ACDV stands for Automated Credit Dispute Verification, which the e-Oscar system supports. *See* https://www.e-oscar.org/implementation/about-us

13

in Cenlar's system regarding the bankruptcy discharge was not yet accurate. But later, after Plaintiff brought the dispute, Cenlar made the appropriate correction. (*Id.*, PageID.256–257.) Mr. Parish stated in explanation, "the balances are showing on the system, but nothing was reported to the credit bureaus. The balances on these disputes for whatever reason were reflecting the amounts that were actually on our system." (*Id.*, PageID.261.) He further testified that, "Mr. Krueger did not owe Cenlar on these loans. However, all I'm saying is these balances were still on our system of record that was, you know, furnished in this information." (*Id.*, PageID.266.) Accordingly, Cenlar argues, no incorrect reporting was done, and the corrections were made according to Cenlar's dispute policy by March 2019.

In response, Plaintiff argues that Cenlar's investigation of his dispute was not just defective; rather, it was "nothing short of intentional." (ECF No. 47, PageID.750.) He argues that the discharged loan was reported "continually," however, he has not set forth any evidence of this. Nor does he rebut with any supporting facts that contradicts Mr. Parish's denial that any "continual" reporting took place. (*Id.*)

Plaintiff also argues that Cenlar's awareness of Plaintiff's bankruptcy as early as 2014 is evidence of its willful violation of the FCRA in 2018. (ECF No. 47, PageID.750.) Cenlar's knowledge of the fact that a bankruptcy proceeding was pending when it began servicing the loan cannot be a basis of willful disregard of its obligations four years later.

Finally, Plaintiff appears to argue that, since the FCRA does not define "willful," the Court should impose a definition of "willful" that would, in effect, create a rule where any incorrect balance showing in Cenlar's system warrant a finding of willfulness even when they are corrected following submission of a dispute. However, the Sixth Circuit, as set forth above, has provided guidance on interpreting the term "willful," which is not aligned with Plaintiff's approach. And here, there is nothing akin to, for example, sending a check to the plaintiff at a wrong address or telling the plaintiff he would have to file a police report as in *Boggio*, or requesting Plaintiff take some other action before it would investigate further. In sum, Plaintiff does not cite to any evidence to support this claim of willfulness, recklessness, or intentionality.

Accordingly, Cenlar's motion for summary judgment is granted as to Plaintiff's claim under 15 U.S.C. § 1681n for willful noncompliance. Plaintiff's claim under § 1681n is dismissed with prejudice.

### 2. Negligent Investigation

Having dismissed Plaintiff's claim for willfulness under § 1681n of the FCRA, Plaintiff's remaining claim is for negligence under 15 U.S.C. § 1681o. Defendant argues that summary judgment should be granted in its favor on this claim because Plaintiff is unable to prove actual damages, which are required under 15 U.S.C. § 1681o. 15 U.S.C. § 1681o provides the following with regard to damages for furnisher negligence:

> Any person who is negligent in failing to comply with any requirement imposed under this title [15 USCS §§ 1681 *et seq*.] with respect to any consumer is liable to that consumer in an amount equal to the sum of—
>
> (1) any actual damages sustained by the consumer as a result of the failure[.]

Additionally, "[i]n order to recover actual damages, a plaintiff must show that the violation of the [FCRA] caused the loss of credit or some other harm." *Bach v. First Union Nat. Bank*, 149 F. App'x 354, 360–61 (6th Cir. 2005.).

16

When analyzing a party's standing to make a claim under the FCRA, the Supreme Court stated that "the injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete and particularized.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Env'tl Svs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). The Court noted that a plaintiff under the FCRA must allege more than "a bare procedural violation," because "[a] violation of one of the FCRA's procedural requirements may result in no harm." *Id*. at 1550. Rather, a plaintiff's injury must be both concrete and particularized.

With respect to a no harm violation, the Supreme Court explained that if the agency used an incorrect zip code, it may be that the agency may have committed a procedural violation, but "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id*. The Court stated that when analyzing such claims involving intangible harms, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id*. at 1549.

The Sixth Circuit applied this principle in *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (2020). There, the plaintiff received two letters from the defendant law firm regarding two debts he owed to a bank. The plaintiff did not dispute the debts, but alleged that the letters "made him feel anxious and fear that [the defendant] would sue him if he did not promptly pay." *Id*. at 859. The plaintiff sued under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq*. The Court applied the rules of *Spokeo* and the FCRA in examining the emotional distress claim set forth, and stated, "[i]t is far from clear that a bare allegation of anxiety is a concrete injury." *Id*. at 863. The Court determined that cases where "emotional distresses were accompanied by corroborating allegations that established more than bare anxiety" tend to "make sense," but "anxiety alone appears to fall short of a cognizable injury as a matter of general tort law." *Id*. at 864.

Here, Plaintiff has not made a showing of a concrete and particularized injury in fact. This is particularly the case because he concedes that he did not apply for credit and cannot demonstrate that any alleged misreporting "caused the loss of credit or some other harm." *Bach*, 149 F. App'x 360–61. He admitted that he did not intend to begin

rebuilding his credit for the "first couple months out" of bankruptcy. After that point, he intended to take on some small debt to begin rebuilding his credit score. (ECF No. 33-3, PageID.331–32.) Plaintiff's position is that the inaccurate CRA reports prolonged his ability to obtain a favorable rate to purchase a family car, and that instead, he had to spend money fixing the car he already owned. (*Id.*; ECF No. 33, PageID.183.) Plaintiff took out a loan and purchased a car in September 2019, at a favorable rate. (ECF No. 33-3, PageID.353–54.) Neither of these facts support a claim for damages.

Plaintiff also argues that his damages are shown by his emotional distress and the appearance of a physical tick. (ECF No. 33, PageID.175; ECF No. 33-3, PageID.359–60.) Plaintiff states that the tick did not occur until after his bankruptcy was over (ECF No. 33-3, PageID 359), and he stated that the five years during bankruptcy were very stressful. Furthermore, both Plaintiff's spouse and mother testified that he developed physical symptoms of stress during the bankruptcy, not after it. (ECF No. 40, PageID.597.) Plaintiff never sought treatment for his physical symptoms and did not mention them at his regular checkup with his physician. (ECF No. 33-3, PageID.359–60.) Defendant persuasively

argues that even if Plaintiff experienced the physical tick following his bankruptcy case, he cannot show that it was traceable to Defendant's actions. (ECF No. 40, PageID.596 (citing *Bucholz*, 946 F.3d at 866).) In sum, even when viewing the facts in the light most favorable to Plaintiff, he does not support his bare allegations with evidence and there is not a cognizable injury appropriate for submission to a jury.

The Court acknowledges that Plaintiff experienced frustration over the length of time that it took Cenlar to correct the information about his discharged loan in its system. However, there is no showing that Cenlar erred beyond a mere procedural violation, if that, which is not enough to sustain this case under *Spokeo*. Plaintiff must be able to set forth a more concrete and particularized showing of damages for this case to go before a jury. Accordingly, Cenlar's motion for summary judgment is granted. Plaintiff's negligence claim under the FCRA is dismissed with prejudice.

## B. Plaintiff's Motion for Summary Judgment

Plaintiff also moves for partial summary judgment against Cenlar. (ECF No. 33.) He argues that Cenlar conducted an unreasonable investigation of his dispute as a matter of law, and that summary judgment should be granted in his favor. However, for the reasons set

forth above, Plaintiff's two claims are dismissed. Plaintiff's motion for summary judgment is denied.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS Cenlar's motion for summary judgment (ECF No. 40) and DENIES Plaintiff's motion for partial summary judgment (ECF No. 33.) The case is dismissed with prejudice.

IT IS SO ORDERED.

Dated: September 29, 2020          s/Judith E. Levy
Ann Arbor, Michigan              JUDITH E. LEVY
                                 United States District Judge


**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 29, 2020.

                                 s/William Barkholz
                                 WILLIAM BARKHOLZ
                                 Case Manager